## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STACEY M. F.,
*Plaintiff,*

v.

KILOLO KIJAKAZI,
ACTING COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,
*Defendant.*

No. 3:20-cv-01910 (VAB)

## RULING AND ORDER ON MOTIONS REGARDING THE COMMISIONER'S DECISION

Stacey M. F. ("Plaintiff") has filed this administrative appeal under 42 U.S.C. § 405(g)

against Kilolo Kijakazi,[1] the Acting Commissioner of Social Security ("Defendant" or "the

Commissioner"), seeking to reverse the decision of the Social Security Administration denying

her claim for Title II disability insurance benefits under the Social Security Act and her claim for

Title XVI supplemental security income benefits under the Social Security Act. Compl. ¶ 1, ECF

No. 1 (Dec. 22, 2020) ("Compl.").

Plaintiff has moved for an order reversing the decision of the Commissioner or, in the

alternative, an order remanding the case for a *de novo* hearing. *See* Pl.'s Mot. to Reverse the

Decision of the Commissioner, ECF No. 18 (June 22, 2021); Mem. of Law in Supp. of Pl.'s Mot.

to Reverse the Decision of the Commissioner, ECF No. 18-2 (June 22, 2021) ("Pl.'s Mem.").

---

[1] When a party in an official capacity resigns or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party, regardless of the party's failure to so move or to amend the caption; the Court may also order such substitution at any time. *See* Fed. R. Civ. P. 25(d); *see also Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018); *Tanvir v. Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018). The Clerk of Court therefore will be ordered to change the defendant of the case from Andrew Saul to Kilolo Kijakazi. *See* Soc. Sec. Admin., *Dr. Kilolo Kijakazi: Acting Commissioner*, https://www.ssa.gov/agency/commissioner.html (last visited March 17, 2022).

The Commissioner has moved for an order affirming the agency's decision. *See* Def.'s Mot. for an Order Affirming the Decision of the Commissioner, ECF No. 22 (Sept. 20, 2021) ("Def.'s Mot.").

For the following reasons, Plaintiff's motion is **DENIED**.

The Commissioner's motion is **GRANTED** and, accordingly, the decision of the Commissioner is **AFFIRMED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[2]

Born in 1990, Plaintiff reached the age of twenty-four at the time of the alleged onset of her disability. *See* Tr. of Administrative Proceedings at 284, ECF No. 16 (Apr. 26, 2021) ("Tr.").[3] Plaintiff completed her studies in the eleventh grade and does not have a GED. *Id*. at 47.

Before the alleged onset of her disability, Plaintiff worked "on and off" as a cashier for approximately seven years, as a kitchen helper in a nursing facility for approximately one year, and as a telemarketer for a siding/windows business for less than one year. *Id*. at 344. Plaintiff

---

[2] As explained below, Plaintiff filed a Statement of Material Facts pursuant to the Court's Standing Scheduling Order. *See* District of Connecticut Standing Scheduling Order—Social Security Cases 3 (Nov. 15, 2018), http://www.ctd.uscourts.gov/sites/default/files/general-ordes/18-26_Standing% 20Scheduling% 20Order-% 20Social% 20Security% 20Cases_0.pdf ("Revised Standing Scheduling Order") ("Plaintiff shall file, as a separate document, a Statement of Material Facts consisting of numbered paragraphs and supported by specific page citations to the Certified Administrative Record. The statement must reference facts in the [ ] Record as opposed to conclusions of law."). The Commissioner subsequently filed a response to Plaintiff's Statement of Facts. *See id.* ("Within 60 days after Plaintiff files the Statement of Material Facts, the Defendant shall file a responsive statement of facts that corresponds to Plaintiff's Statement of Material Facts and indicate if the Defendant adopts the contents of each paragraph as presented. . . ."). Thus, this section consists of facts upon which the parties appear to agree, based on both parties' filings and the record, except where judicial notice is taken. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[3] Pagination refers to pagination provided by the Court's Electronic Filing System.

has not engaged in substantial gainful activity since her alleged onset date. *Id.* at 20; Pl.'s Statement of Material Facts ¶ 47, ECF. No. 18-1 (June 22, 2021) ("Pl.'s SOMF").

The Administrative Law Judge ("ALJ") found Plaintiff to have the following severe impairments: "seizure disorder, migraine headaches, carpal tunnel syndrome, obesity, type 1 diabetes mellitus, depression, and posttraumatic stress disorder." Tr. at 20. The ALJ concluded that Plaintiff's hypothyroidism "is a nonsevere impairment" because "the purpose of her treatment was merely to monitor for the development of thyroid related symptoms." *Id.*

### 1. Medical History

On a December 4, 2013 visit, Dr. Donald S. Levine noted that Plaintiff has had Type 1 diabetes since the age of three. *Id.* at 465–67. The notes also state that Plaintiff was using an insulin pump and that her hemoglobin $A_1C$ level was 9% in July 2013, down from 12.2% in January 2013. *Id.* Dr. Levine additionally noted that Plaintiff has had a history of diabetic ketoacidosis ("DKA") since April 2013, a multinodular goiter discovered in a March 2013 thyroid ultrasound, and hypothyroidism, for which she was taking levothyroxine. *Id.* The notes also state that Plaintiff has mild dyslipidemia, exogenous obesity, a history of cellulitis of the abdominal wall, a history of postpartum depression (for which she was taking Zoloft), low vitamin D, reactive airway disease, fatigue, and a seizure disorder. *Id.*

On December 16, 2013, Plaintiff presented for a visit with Rena Jacobs, a Physician's Assistant ("PA-C"), concerning "upper respiratory infection symptoms" and "bilateral abdominal and back pain." *Id.* at 480. Plaintiff told PA-C Jacobs that the back pain, which started in her lower back and radiated upward, started five days before the visit, and that she was also experiencing some increased urine frequency. *Id.* PA-C Jacobs noted that Plaintiff likely had an

upper respiratory infection that may have also caused back strain due to coughing. *Id.* at 481. PA-C Jacobs ordered a urine test in light of blood found in Plaintiff's urine. *Id.*

On February 20, 2014, Plaintiff saw Lauryn Buller, an Advanced Practice Registered Nurse ("APRN"), for a follow-up visit and to refill some of her medications. *Id*. at 483–85; Pl's SOMF ¶ 6. Plaintiff reported to APRN Buller that her mood and anxiety were "well controlled with Zoloft 150 mg daily" and that she was not having panic attacks or suicidal ideation. Tr. at 483. Plaintiff also reported headaches and increased stress, which were "[p]artially responsive to [A]dvil" and light sensitivity. *Id*. APRN Buller recorded Plaintiff's weight at 220 pounds and her Body Mass Index ("BMI") at 40.56, which fell into the category of "extreme obesity." *Id.*; Pl.'s SOMF ¶ 6. APRN Buller refilled Plaintiff's Zoloft prescription for her depressed mood, and also her Keppra prescription for seizures. Tr. at 484. APRN Buller also noted that Plaintiff "need[ed] to [follow up] with neurology" about her seizures. *Id*. APRN Buller recommended that Plaintiff see a dentist for a night guard, to help with her headaches. *Id.*

On April 8, 2014, Plaintiff saw Dr. May Habboosh for a sore throat. *Id*. at 486–87. Her weight was recorded at 222 pounds and her BMI at 40.93. *Id*. at 486. Dr. Habboosh prescribed a Zithromax Z-Pak Tablet for bronchitis. *Id*. Dr. Habboosh noted that Plaintiff presented "normal hygiene and grooming . . . [and] eye contact appropriate." *Id.*

On May 28, 2014, Plaintiff visited APRN Buller for a sore throat that had lasted for about three weeks and bilateral ear pain, which APRN Buller diagnosed as acute pharyngitis. *Id*. at 488–90.

On May 29, 2014, Plaintiff visited APRN Buller for a follow-up appointment. *Id*. at 491–93. According to APRN Buller's notes, Plaintiff "[r]eport[ed] mood and anxiety well controlled with Zoloft 150 mg daily – no panic attacks, no suicidal ideation, sleeping well. Increased stress

4

regarding home situation however coping well." *Id.* at 491. APRN Buller noted that Plaintiff was "[d]ue for [a] neurology [follow-up] for seizure disorder," which Plaintiff had not scheduled yet. *Id.* APRN Buller also observed that Plaintiff had a fractured left foot and that her foot and ankle were in a cast. *Id.*

On July 9, 2014, Plaintiff visited Dr. Levine complaining of "significant brittle glucose results ranging between 30 and 500." *Id.* at 461–64. Dr. Levine noted that Plaintiff's "sensor [was] not operating properly" and as a result she "tries to check her sugar every 2 hours throughout the day but her place of work does not allow that." *Id.* at 461. Dr. Levine indicated that he wrote a note to Plaintiff's place of work, Dunkin Donuts, saying that "she must check her sugars every 2 hours for her brittle diabetes." *Id.* at 461, 463. He wrote that Plaintiff's $A_1C$ of 11.5% was "terrible" and that she would not be able to do elective surgery for her broken left foot until her $A_1C$ level went below 8.5%. *Id.* at 461. Dr. Levine also indicated that Plaintiff complained of "increased anxiety" and that she would contact her primary care provider about "starting an anxiolytic agent." *Id.* at 463.

On September 18, 2014, Plaintiff visited APRN Lauryn Slomkowski[4] complaining of "nasal congestion, headache, dizziness, nausea, productive cough, wheezing, chills and [a] sore throat[.]" *Id.* at 494. APRN Slomkowski diagnosed Plaintiff with acute nasopharyngitis, "a viral illness." *Id.* at 494–95.

On October 2, 2014, Plaintiff again saw APRN Slomkowski. At this visit, Plaintiff reported that she had been hospitalized from September 22, 2014 to September 25, 2014, at Middlesex Hospital, for "headache, dizziness, [and] visual hallucinations." *Id.* at 496–98. APRN Slomkowski also noted that Plaintiff saw a neurologist on September 29, 2014 and that the

---

[4] Plaintiff stated in her Statement of Facts that "it appears APRN [Lauryn] Slomkowski and APRN [Lauryn] Bulller are the same person." Pl.'s SOMF 4 n.5.

neurologist advised Plaintiff that she was "having seizures [that were] possibly causing [her] chronic headaches."[5] *Id.* at 496. The neurologist increased Plaintiff's Topamax prescription to 100 mg and started her on Valium, and also recommended a follow-up MRI due to "new paresthesia to [the] face and hand." *Id.* During the visit, Plaintiff reported still having "headache[s] with flashing lights in all visual fields." *Id.* APRN Slomkowski also wrote that Plaintiff reported "dysuria, urinary frequency, and mild intermittent bilateral flank pain x 2 days." *Id.* A urinalysis showed Plaintiff's glucose sample at 1000. *Id.* at 497. APRN Slomkowski diagnosed Plaintiff with a lower urinary tract infection and prescribed Cipro. *Id.*

On October 13, 2014, Plaintiff visited Dr. N. Esra Hatiboglu for a sore throat. *Id.* at 499. Dr. Hatiboglu diagnosed Plaintiff with pharyngitis and prescribed azithromycin tablets. *Id.* at 500.

On November 20, 2014, Plaintiff saw APRN Slomkowski and reported "increased depression over the past two weeks." *Id.* at 503. According to APRN Slomkowski's notes, Plaintiff reported that she "thought about" but did not act on "cutting." *Id.* She allegedly did not have "suicidal or homicidal thoughts." *Id.* APRN Slomkowski recommended that Plaintiff increase her dosage of Zoloft and referred Plaintiff to Middlesex Hospital Behavioral Health to see a therapist. *Id.* at 505. The notes also reported that Plaintiff was "following with neurology for seizure disorder." *Id.* at 503.

On November 24, 2014, Plaintiff attended a follow-up appointment with Dr. Levine. Tr. at 452–55 (Donald Levine, M.D., Middlesex Hospital Multispecialty Group, Progress Notes (Nov. 24, 2014)). Dr. Levine noted that Plaintiff's $A_1C$ level was at 9.6% on August 12, 2014,

---

[5] Neither records from the September 22–25 hospital stay nor records from the September 29 neurologist appointment are in the record. *See* Pl.'s SOMF at 4 n.6.

and that Plaintiff did not get her $A_1C$ reading before her November 24 appointment because "she had a number of other issues with . . . newly diagnosed seizures." *Id.* at 452.

On December 16, 2014, Plaintiff saw neurologist Dr. Nabi Chowdhury for seizures and chronic headaches. *Id*. at 555–59. Dr. Chowdhury noted that Plaintiff "has not had any convulsions from her seizures" since 2010. *Id.* at 555–56. Dr. Chowdhury also noted that Plaintiff had "continued visual hallucinations, where she sees people and animals," and that her daily headaches were associated with other symptoms: "photophobia, phonophobia, nausea, intermittent vertigo lasting 5-10 minutes, seeing double, flashes of light," and "vision go[ing] black for about [one] minute." *Id.* at 555. Dr. Chowdhury also noted that the chronic daily headaches "may at least be partially due to underlying psychiatric comorbidities" and that they "may be chronic basilar migraines." *Id.* at 557.

Dr. Chowdhury also stated that she did not "think that the hallucinations are due to seizures" and that Plaintiff may have "depression with psychotic features." *Id*. Dr. Chowdhury noted that Plaintiff "ha[d] remained seizure-free since 2010" and that she had "a longstanding history of poorly controlled diabetes." *Id*. In addition, Dr. Chowdhury noted that Plaintiff "may have both large and small fiber neuropathies" but that "her sensory exam did have a component of psychological overlay." *Id*. Finally, Dr. Chowdhury assessed that Plaintiff's headaches may have been caused or worsened in part by "underlying sleep apnea." *Id*.

Dr. Chowdhury ordered that Plaintiff stop using Topamax and switch to Divalproex. *Id*. Dr. Chowdhury also referred Plaintiff for a polysomnogram; a sleep study to check for sleep apnea; a psychiatry consultation for depression, panic attacks, and hallucinations; and an EMG exam to "look for neuropathy versus radiculopathy." *Id*. at 557–58. Dr. Chowdhury also noted that Plaintiff's standard gait was "normal" and that her strength was "5/5 proximally and distally,

except for the left abductor pollicis brevis muscles which was 4+." *Id*. at 556; Def's Resp. to Pl's Statement of Facts ¶ 11, ECF. No. 22-2 (Aug. 20, 2021) ("Def.'s SOMF").

On December 19, 2014, Plaintiff saw APRN Slomkowski and reported "significant improvement in moods" and that her depression was "resolved." Tr. at 511–517. APRN Slomkowski also noted that Plaintiff reported "increased anxiety over the past week" with "no identifiable trigger." *Id*. at 511. APRN Slomkowski prescribed buspirone (Buspar) and referred her to the Behavioral Health service. *Id*. at 511, 517.

On January 22, 2015, Dr. Chowdhury performed an EMG examination and diagnosed Plaintiff with "bilateral median neuropathies at or distal to the wrist, consistent with carpal tunnel syndrome." *Id*. at 594–95. The results noted that the carpel tunnel syndrome was "mild to moderate . . . on the right and very mild on the left." *Id*. at 594; Def.'s SOMF ¶ 13.

On January 23, 2015, Plaintiff saw APRN Slomkowski and reported that she had felt dizzy for the past 48 hours, which she described as "vertigo" that was "[t]riggered by movement." Tr. at 520. APRN Slomkowski diagnosed Plaintiff with vertigo and prescribed Zofran. *Id*. at 520–21.

On February 13, 2015, Plaintiff again saw Dr. Chowdhury as a follow-up for her seizures and chronic headaches. *Id*. at 560–563. Dr. Chowdhury reported that Plaintiff's headaches had decreased in severity after he started her on Topamax, but they were "still constant." *Id*. at 560. Plaintiff also reported that the parathesias in her hands was "worse." *Id*. Dr. Chowdhury recommended that Plaintiff "slowly increase" her Topomax dosage to address the headaches and that she purchase wrist splints for her carpal tunnel syndrome. *Id*. at 562.

On February 23, 2015, Plaintiff saw APRN Slomkowski as a follow-up to her emergency room visit on February 20, 2015 due to sharp chest pain radiating down her left arm. *Id*. at 523–

24. The tests conducted on Plaintiff, including a chest X-ray, were negative, according to APRN Slomkowski's notes. *Id.* at 523. APRN Slomkowski also noted that Plaintiff's chest pain was constant at 9.5/10 and had remained unchanged since its onset. *Id.* APRN Slomkowski notes state that, "considering [the] persistent [chest pain] now associated with tachycardia and low-grade fever," Plaintiff "likely needs inpatient workup including ECHO." *Id.* at 524. The notes state that Plaintiff agreed to go immediately to the emergency room. *Id.*

On February 24, 2015, Plaintiff saw APRN-BC Kathryn Tierney for a follow-up appointment regarding her diabetes. *Id.* at 564–66. APRN-BC Tierney's notes indicate that Plaintiff was told at her recent emergency room visit that she had "inflammation around [her] heart" and that the pain "ha[d] gotten worse." *Id.* at 564. She also noted that Plaintiff was supposed to see a cardiologist on that day. *Id.* The notes also state that Plaintiff's glucose levels were "very well-controlled" at times, but at others they were "in the 400s." *Id.* APRN-BC Tierney also noted that Plaintiff was "not eating consistently" "because of her acute pain," and that she was "very afraid of DKA [diabetic ketoacidosis]." *Id.* at 564–65.

On March 18, 2015, Plaintiff saw APRN Slomkowski regarding continued chest pain and diarrhea. *Id.* at 525–27. Her glucose level was recorded at 474. *Id.* at 526.

On July 9, 2015, Plaintiff saw PA-C Jacobs regarding "severe neck pain" on the right side of her neck, which was preventing her from turning her head in either direction. *Id.* at 535–36. PA-C Jacobs noted that Plaintiff went to the emergency room for her neck pain on July 7 and had benign imaging. *Id.* at 535. PA-C Jacobs prescribed Flexeril. *Id.*

On October 26, 2015, Plaintiff again saw PA-C Jacobs for pain in both ears and a sore throat. *Id.* at 537–38. Plaintiff's BMI was measured at 41.11. *Id.* at 537. PA-C Jacobs recommended a trial of Flonase. *Id.*

On October 30, 2015, Plaintiff saw Dr. Elena Bortan, a neurologist. *Id*. at 570–73. Dr. Bortan noted that Plaintiff reported having a history of childhood seizures and that she had "20 grand mal[] seizure about 4 years ago," and that she had started taking Keppra two years prior to seeing Dr. Bortan. *Id.* at 570. Dr. Bortan also noted the following:

> [Plaintiff] reported having flashing lights, aura (flashing lights, different colors), lasting [a] couple of minutes, followed by lightheadedness and extreme headache. The intensity of [the] headache is usually 10/10. Headache is located on the forehead covers entire head. . . . Frequency: 2-3 times / week. Headache lasting [a] few hours after aura. Advil is not helping. She reported that she did not notice a decrease in frequency of headache since taking Topamax.

*Id*.

Dr. Bortan noted that a 72-hour EEG monitoring conducted in June 2015 indicated a "normal EEG, without significant changes during periods of flashing lights" and that this result "exclude[d] [the] possibility of seizures during her visual disturbances." *Id.* at 570, 572. Dr. Bortan further noted that Plaintiff's seizures were "well controlled" and that the last one was in 2010. *Id.* at 572. Dr. Bortan ordered a continuation of Keppra and upward titration of Topamax. *Id.* Dr. Bortan also noted that Plaintiff had a "normal" gait, "5/5" strength, "intact" coordination, and "intact" sensation for light touch, with "decreased pin prick bel[ow] knees and bel[ow] elbows." *Id.* at 571; Def.'s SOMF ¶ 19.

On November 5, 2015, Plaintiff received an evaluation for mental health services from Santia Berberena, M.A. Tr. at 603–607. Ms. Berberena found that Plaintiff had a significant history of trauma and suffered from depression and anxiety, as well as a history of self-injury. *Id.* at 603, 606. Ms. Berberena also noted that Plaintiff was dating someone who was a "good support" and that she was oriented with a dysphoric mood, appropriate affect, organized thought process, intact memory, unimpaired attention, average intelligence (although she had been tested

for learning disabilities as a child and was told that she learned "at a slower pace than her peers), and fair insight and judgment. *Id.* at 605–06. After reviewing Plaintiff's mental health history and current state at length, Ms. Berberena recommended individual psychotherapy and medication management. *Id.* at 606.

Plaintiff saw Ms. Berberena again for therapy sessions on November 16, 2015, *id.* at 608–09; November 25, 2015, *id.* at 610–11; and January 7, 2016, *id.* at 612–13. During the mental health examination on November 16, Plaintiff "indicate[d] moderate depression." *Id.* at 608. Ms. Berberena's discharge summary from March 16, 2016 "assumed that [Plaintiff's] prognosis would be fair, given the fact that she did not resume . . . treatment." *Id.* at 616.

On March 31, 2016, Plaintiff saw Dr. N. Esra Hatiboglu for abdominal pain that was radiating to her back and right shoulder and for concerns that she was having "another episode" of kidney infection. *Id.* at 539–41. Dr. Hatiboglu ordered an ultrasound of Plaintiff's abdomen. *Id.* at 540. Plaintiff's $A_1C$ level was reported as 9.7% and lab results showed a blood glucose level of 311. *Id.* at 540–41.

On April 28, 2016, Plaintiff saw APRN-BC Tierney about her diabetes. *Id.* at 577–79. A download of Plaintiff's insulin pump showed blood glucose levels "in the 50-100 range or above 300, not much in between." *Id.* at 577. Plaintiff complained of ongoing fatigue, and her BMI was recorded at 42.38. *Id.* at 577–78. The notes from this visit also indicate that Plaintiff was "having [an] intermittent feeling of fullness on the right side of her neck," and that a review of her record revealed that a 2013 ultrasound "showed multiple nodules with at least two that were over 1cm." *Id.* at 578. Plaintiff was instructed to schedule a follow-up ultrasound. *Id.* at 579.

On May 10, 2016, Plaintiff again saw APRN-BC Tierney for a follow-up regarding issues with her insulin pump. *Id.* at 838–41. APRN-BC Tierney noted that Plaintiff was having

11

"intermittent hypoglycemia with numbers in the 60s" and that her blood glucose was "relatively frequent[ly] above 400." *Id.* at 838. APRN-BC Tierney also noted that Plaintiff was on daily levothyroxine for her hypothyroidism, that her TSH was markedly elevated, that her fatigue was ongoing, and that she denied any new overt symptoms of hyper- or hypothyroidism. *Id.* Plaintiff's thyroid nodule in the left lobe was measured at 2.5 centimeters, and a biopsy was scheduled. *Id.* at 838, 840.

On July 16, 2016, Plaintiff received an evaluation from Lorelei Muresan, Psy.D., based on a referral for depression and anxiety. *Id.* at 769–73. Dr. Muresan noted that Plaintiff's primary care provider was unwilling to prescribe "psychotropic medications." *Id.* at 769. She further noted that Plaintiff was on Buspar and Zoloft but had no refills and was experiencing "high anxiety." *Id.* at 771. Dr. Muresan's "diagnostic impression" included recurrent and moderate major depressive disorder; panic disorder; provisional post-traumatic stress disorder; provisional bipolar disorder; medical issues from overweight, a history of seizure disorder, and diabetes which is insulin dependent; and interpersonal issues. *Id.* at 772. She also noted that Plaintiff was alert and oriented with an "alright" or anxious mood, congruent affect, organized thought process, intact memory and attention, average intelligence, fair insight and judgment, and a history of a learning disability. *Id.*; Def.'s SOMF ¶ 23. Plaintiff was assigned to a therapist and a psychiatrist. *Id.* at 773.

On July 21, 2016, Plaintiff saw APRN-BC Tierney, who recorded her $A_1C$ at 11.2 (compared to the 4-6% normal range). Tr. at 584–87. Plaintiff's Glomerular Filtration Rate (GFR) was labeled "low," at 55, and her glucose level was labeled high, at 499. *Id.* at 585. APRN-BC Tierney increased Plaintiff's daily levothyroxine dose to address the hypothyroidism. *Id.* at 586.

On July 26, 2016, Plaintiff began a course of mental health therapy with LCSW Amanda McJunkins for depression and anxiety. *Id*. at 774–75. At the first session, Plaintiff reported that she was "sexually abused by a relative . . . . [f]rom age 4 to age 13." *Id*. at 774.

On July 29, 2016, Plaintiff saw Dr. Joyce Tinsley for psychiatric evaluation and medical management. *Id*. at 776–78. Plaintiff indicated that her nightmares had become "more intense" over the past year, that she had flashbacks to being abused, and that she avoids confrontation and isolates herself. *Id*. at 776. Dr. Tinsley recommended increased doses of sertraline (Zoloft) and Buspar, and noted that another increase in sertraline "w[ould] likely be made." *Id.* at 778.

On August 12, 2016, at an appointment with LCSW McJunkins, Plaintiff complained of not sleeping much at night, lacking motivation, and spending most of her time at home on the couch. *Id*. at 780. LCSW McJunkins also reported that Plaintiff had "dark circles around her eyes," "appeared exhausted," and received a PHQ-9 score "indicating severe depression." *Id.* At sessions on August 12 and August 22, 2016, LCSW McJunkins found Plaintiff to have "severe depression." *Id*. at 780–81.

On August 25, 2016, Plaintiff saw Dr. Tinsley for medication management. *Id*. at 782–83. Plaintiff indicated that she "continues to be depressed," that she "does not see that the [Zoloft and Buspar] has been helpful to her," and that she "continues to feel panic, anxiety, and nightmares." *Id.* at 782. Dr. Tinsley noted that Plaintiff's "affect appears to be somewhat depressed" and recommended increasing her Zoloft dose and adding doxepin and alprazolam, in order to address the three panic attacks she was having per week. *Id.*

On August 30, 2016, Plaintiff reported to LCSW McJunkins that she was having at least one panic attack per day and continued to feel unmotivated. *Id.* at 784–85. LCSW McJunkins noted that Plaintiff's PHQ-9 "indicat[ed] severe depression." *Id*. at 784.

13

In a medical source statement completed on September 7, 2016, LCSW McJunkins and Dr. Sergio Mejia listed Plaintiff's diagnoses as Post-Traumatic Stress Disorder ("PTSD"), Depressive Disorder – Unspecified, and Anxiety – Unspecified. *Id*. at 638–40. LCSW McJunkins and Dr. Mejia opined that Plaintiff's inability to work was expected to last for six months or more, that they did not know when she would be able to return to work, and that she is not able to work on a part-time basis. *Id.* at 638–39. The statement also notes that Plaintiff suffered from "panic attacks, severe anxiety, depression, difficulty concentrating, difficulty sleeping [at] night, [and] flashbacks of past trauma," as well as "lack of motivation, [feeling] tired, crying spells, feelings of worthlessness, depression, [and] flashbacks of past abuse." *Id.* at 639. Plaintiff's prognosis, according to the medical source statement, was "moderate given [that Plaintiff] engage[d] in w[ee]kly therapy and medication management." *Id.*

On September 9, 2016, Plaintiff called LCSW McJunkins to report that her mother was in a coma following a heart attack and was not expected to survive. *Id*. at 787. Plaintiff called to request Xanax. *Id.*

On September 14, 2016, Plaintiff saw Dr. Tinsley for a medical visit. *Id*. at 788. Plaintiff reported that her mother had passed away and that she "experiences some guilt about what she might have done differently . . . to save her mother's life." *Id.* Dr. Tinsley noted that Plaintiff was "tearful and somewhat stunned by her mother's death" and that she was "overwhelmed [and] anxious, although she had the capacity for humor." *Id.* Dr. Tinsley kept Plaintiff on sertraline, Buspar, doxepin, and alprazolam; she also prescribed clonazepam (Klonopin) on a short-term basis. *Id*. at 788–89.

On October 25, 2016, Plaintiff saw APRN-BC Tierney for a diabetes follow-up appointment. *Id*. at 657–59. APRN-BC Tierney noted that Plaintiff's mother had passed away in

September and it had "been very difficult for [Plaintiff] given that her mom was a huge source of support for [Plaintiff]'s son." *Id.* at 657. APRN-BC Tierney also noted that Plaintiff "had a lot of anxiety" and a "respiratory illness that she is still recovering from." *Id.* According to APRN-BC Tierney's notes, Plaintiff was "still not blousing [the insulin pump] consistently" because she "gets distracted and forgets," but she was "more diligent about correcting for [blood glucose levels] over 400." *Id.* Plaintiff's blood glucose levels were "almost all in the 300-600 range." *Id.* APRN-BC Tierney also noted that Plaintiff was "not eating consistently because of increased anxiety." *Id.* Plaintiff's BMI was recorded at 42.01. *Id.* at 658. According to the notes, Plaintiff missed her thyroid nodules biopsy because of her mother's death. *Id.* at 657–58.

On November 11, 2016, Plaintiff saw neurologist Dr. Elena Bortan complaining of a worsening headache. *Id.* at 660–63. Dr. Bortan noted that Plaintiff "has had headaches almost every day since September" and that she described them as "pressure pain behind the eyes." *Id.* at 660. Dr. Bortan also noted that Plaintiff had been under stress due to her mother's death. *Id.* Dr. Bortan's notes state that

> [Plaintiff] describe[d] an average 4 to 5 headaches a week. The headache is not decreased by Motrin. Sometime[s] the headache could be decreased by sleeping. The headache can be associated by photosensitivity and phonosensitivity. The headache[s] interfere with the daily living activities, when she has a headache she cannot talk[,] she cannot walk around[, and] she prefers to go in bed in [a] dark space. She feels like headache is decreased when lying down with eyes closed. She described aura: [bright] lights, zigzag lines[.] Numbness on her hands, noticed randomly with or without headaches. . . . She denied seizure in the last year. She gained about 30 pounds in the last year.

*Id.* Dr. Bortan also noted that Plaintiff "was seen in consultation by Opthalmology Physician at 'Durham Family Eye Center' in October 2016" regarding "increased intracranial pressure in the settings of worsening headache and gaining weight." *Id.* Plaintiff's BMI was recorded at 42.94.

*Id.* at 661. Dr. Bortan stated that Plaintiff's headaches "have more characteristics of intractable migraines," and noted that a previous lumbar puncture test "was noted to be normal." *Id.* at 662. Dr. Bortan ordered an increase in Plaintiff's dosage of Topamax and continued her prescription for Keppra. *Id.*

On December 8, 2016, on a referral from Dr. Tinsley, Plaintiff saw Dr. Raymond Morris for PTSD, anxiety, and depression. *Id.* at 816–18. Dr. Morris took over Plaintiff's medication management as of this appointment. Pl.'s SOMF at 12 n.25. Dr. Morris noted that Plaintiff had not had seizures since she began taking Keppra five years prior. Tr. at 816. Plaintiff also reported feeling "panic all the time" and that she had a panic attack the night before. *Id.* at 817. Dr. Morris planned to have Plaintiff taper off Zoloft, start Paxil, and try Prazosin. *Id.* Dr. Morris also noted that Plaintiff was calm and cooperative, alert, oriented, and had a "sad" mood, linear and logical thought processes, intact cognition, fair insight, and good judgment. *Id.*; Def.'s SOMF ¶ 30.

On January 27, 2017, Plaintiff saw Dr. Morris again and reported that she was increasingly "stressed out" due to caring for her five-year-old son and her sister, who had multiple sclerosis and had recently been attacked and left requiring physical therapy. Tr. at 805–07. Plaintiff reported that her sleep was better but that she was still having nightmares and flashbacks. *Id.* at 805. Plaintiff's BMI was recorded at 43.10. *Id.* at 806. Dr. Morris recommended an increased dosage of Prazosin and noted that Paxil seemed to be helping with Plaintiff's mood. *Id.*

On February 1, 2017, Plaintiff saw Dr. Hatiboglu for pain in her "side/stomach region" that had become worse over the past few days. *Id.* at 731–34. Plaintiff's blood glucose level was 500. *Id.* at 732. Dr. Hatiboglu ordered an abdominal CT scan, which was conducted the same

16

day. *Id.* at 903. The radiologist's impression was "[s]plenomegaly, of indeterminate etiology, exclude lymphoproliferative disorder." *Id.*

The record indicates that Plaintiff continued to see LCSW McJunkins through March 23, 2017. *Id.* at 803–04. On March 23, 2017, LCSW McJunkins found Plaintiff to have "[m]oderately [s]evere [d]epression" and noted that Plaintiff was focused "on grief surrounding the loss of [her] mother [six] months ago." *Id.* at 804.

On April 21, 2017, Plaintiff saw Dr. Morris and reported that her nightmares and flashbacks "are still quite distressing." *Id.* at 800–02. Plaintiff reported that she continued to "relive" her mother's death and had nightmares involving her mother. *Id.* Plaintiff also reported that she continued to sleep only five or six hours per night, and that she was "tired a lot." *Id.* Dr. Morris ordered an increase in Plaintiff's Prazosin dose. *Id.* at 801. Dr. Morris also noted that Plaintiff was friendly and engaging with normal speech, an "okay" mood, full affect, linear and logical thought processes, intact cognition, fair insight, and good judgment. *Id.*; Def.'s SOMF ¶ 32.

On June 6, 2017, Plaintiff underwent a consultative psychological-mental status examination by Patrick Russolillo, Ph.D., at the request of the Bureau of Rehabilitation Services-Disability Determination Services. Tr. at 753–55. Dr. Russolillo noted that Plaintiff reported having a panic attack "every day where she cannot breathe, her chest hurts and her heart races." *Id.* at 753. Dr. Russolillo also reported that Plaintiff "stated that she has always received special education support for a learning disability" and that she was called a "slow learner" at school. *Id.* at 753–54. On a Montreal Cognitive Assessment, which tests for "mild cognitive dysfunction," Plaintiff scored an 18, "which was below [the] average" score of 26/30. *Id.* at 754. Dr. Russolillo reported that Plaintiff had difficulty with "a measure of executive functioning, attention, delayed

recall and fluency," which "would suggest . . . moderate information processing deficits." *Id.* at

755. Dr. Russolillo also noted that "[a] brief assessment of her decision making would suggest

that she has basic decision making skills." *Id.*

According to Dr. Russoslillo, Plaintiff "seems to be a very sensitive individual who has

limited coping skills and is easily overwhelmed," she has a "history of learning difficulties," and

"there is evidence of information processing deficits." *Id.* Dr. Russolillo's diagnoses were as

follows: PTSD, Panic Disorder, Developmental Disorder of Scholastic Skills – Unspecified (by

history), and Other Specified Depressive Disorder (by history). *Id.* His prognosis was that

Plaintiff is "[g]ood with behavioral health treatment." *Id.*

On July 10, 2017, Plaintiff saw PA-C Jacobs, complaining of right foot pain. *Id.* at 878–

79. PA-C Jacobs ordered an X-ray. *Id.* at 879.

On July 28, 2017, Plaintiff saw Dr. Morris, who reported that she had a broken

metatarsal, was wearing a boot on her right foot ankle, and would be having surgery the

following week "for a screw to be placed in her foot." *Id.* at 797–99. Dr. Morris's notes state that

Plaintiff had run out of her medications and "had been 'all over the place,'" at times going from

"happy and hyper" to "hysterically crying." *Id.* at 797. Dr. Morris prescribed Prozac on an

upward titrating dose and ordered refills of Xanax and Prazosin. *Id.* at 798. Dr. Morris also noted

that Plaintiff was calm and cooperative, alert and oriented, and had a "stressed" mood, linear and

logical thought processes, intact cognition, fair insight, and good judgment. *Id.* at 797; Def.'s

SOMF ¶ 34.

On July 28, 2017, Plaintiff also saw Dr. Hatiboglu for pre-surgical clearance for her foot.

Tr. at 874–77. Dr. Hatiboglu noted the following "[s]ignificant risks for surgery: seizure

disorder, diabetic management – uncontrolled type 1 DM, [and] morbid obesity." *Id.* at 874.

Plaintiff stated that her foot was painful, and Dr. Hatiboglu cleared her for surgery. *Id.* at 874–75.

On October 24, 2017, Plaintiff saw Dr. Morris for medication management. *Id.* 794–96. Plaintiff reported that she had surgery on her right foot, that she was back to walking on it, and that it was "healing well." *Id.* at 794. Dr. Morris also noted that Plaintiff reported that her nightmares and flashbacks were continuing, that her crying was increasing, and that she had stopped taking Prazosin "because she felt it wasn't helpful." *Id.* Dr. Morris ordered refills of Prozac and Xanax. *Id.* at 795. In addition, Dr. Morris noted that Plaintiff was alert and oriented, mildly dysphoric and labile, and had a linear and logical thought processes, intact cognition, fair insight, and good judgment. *Id.* at 794–95; Def.'s SOMF ¶ 36.

On October 25, 2017, Plaintiff saw Karin Sidman-Crogham, M.A., to begin a course of psychotherapy treatment. Tr. at 864–66. The therapy was centered around "unresolved grief" related to Plaintiff's mother's sudden death the year prior. *Id.* at 865. Ms. Sidman-Crogham reported that Plaintiff was calm and cooperative with an euthymic mood and appropriate affect, intact thought process, intact memory, good attention, intact judgment, and intact insight. *Id.*

The record indicates that Plaintiff saw Ms. Sidman-Crogham ten more times between November 2017 and March 2018. Pl.'s SOMF at 15 n.27. At a November 15, 2017 session, Plaintiff discussed her "dysfunctional family dynamics" at length. Tr. at 859–61; Pl.'s SOMF ¶ 37. At each of those sessions, Ms. Sidman-Crogman reported that Plaintiff was calm and cooperative and had an anxious, depressed, or euthymic mood; appropriate affect; intact thought processes; intact memory; good attention; intact judgment; and either intact or, in one case, minimally impaired insight. Def.'s SOMF ¶¶ 53, 57. At almost all of those sessions, Plaintiff

completed a Patient Health Questionnaire-9 to determine her level of depression, and each time her depression was rated as "severe" to "moderately severe." Pl.'s SOMF at 15 n.28.

On December 18, 2017, Plaintiff saw Dr. Hatiboglu with ear pain and an upper respiratory infection. Tr. at 913–14. Plaintiff's BMI was recorded at 42.40. *Id.* at 913. Dr. Hatiboglu prescribed azithromycin to treat the infection and noted that Plaintiff was prone to infection and complications because of her diabetes. *Id.* at 914.

In a medical source statement dated April 24, 2018, Dr. Morris stated Plaintiff's diagnoses as "Major Depressive Disorder recurrent with anxious distress versus Bipolar II Disorder," Panic Disorder, and PTSD. *Id.* at 951–54. Dr. Morris noted that Plaintiff had been prescribed Lamictal for mood and Xanax "as needed for panic attack[s] that can't be managed with coping skills." *Id.* at 951. Dr. Morris identified seven significant signs and symptoms and opined that Plaintiff had "moderate" limitations in all nine areas of limitations in work settings. *Id.* at 953–54. He further noted that Plaintiff had a "serious and persistent" condition due to her PTSD, which required ongoing therapy, and that she had a minimal capacity go adapt to changes in her environment. *Id.* at 954.

He also opined that Plaintiff would be absent from work "about four days per month." *Id.* Dr. Morris agreed that Plaintiff's "impairment lasted or can . . . be expected to last at least twelve months." *Id.* Dr. Morris also rated Plaintiff's mental abilities for unskilled, semi-skilled, and skilled work, as well as abilities for particular types of jobs, as "unlimited or very good." *Id.* at 955–56. Plaintiff notes that "[n]o explanation was provided, and none appears to have been sought" for the apparent "contradiction" in Dr. Morris's medical source statement. Pl.'s SOMF at 18 n.39.

On June 13, 2018, Plaintiff saw Dr. Jessica Reichbind for upper respiratory symptoms. Tr. at 981–82. Dr. Reichbind refilled Plaintiff's inhaler and prescribed medicine. *Id.* at 986-87. Plaintiff's BMI was recorded at 44.78. *Id.* at 986.

On July 20, 2018, Plaintiff again saw Dr. Reichbind about cellulitis, redness, and tenderness around her insulin pump insertion. *Id.* at 984–85. She complained of pain when transitioning from standing to sitting. *Id.* at 984. Dr. Reichbind ordered an abdominal ultrasound, which was performed the same day and showed cellulitis and "[n]o drainable fluid collection. *Id.* at 984, 988.

On July 27, 2018, Plaintiff saw Dr. Hatiboglu, who noted that Plaintiff had visited the emergency room the previous weekend due to "increased swelling and pain" associated with the infection around her insulin pump. *Id.* at 982–83. Dr. Hatiboglu indicated that "incision and drainage was done in the emergency department." *Id.* at 982. Dr. Hatiboglu referred Plaintiff to the University of Connecticut Health Neurology Department to "[rule out] seizure" due to reports that she was "seeing black dots [a] couple of times a week for a month." *Id.* at 982–83. Plaintiff's BMI was recorded at 45.72. *Id.* Dr. Hatiboglu also noted that Plaintiff had "normal muscle tone, normal motor function, [and] sensation grossly intact." *Id.*; Def.'s SOMF ¶ 39.

Plaintiff had follow-up appointments with Dr. Reichbind on August 1 and August 6, 2018 regarding her cellulitis and insulin pump wound. Tr. at 978–79, 980–81. Dr. Reichbind reported Plaintiff's incision to be improving on both visits. *Id.*

On August 16, 2018, Plaintiff saw PA-C Jacobs for follow-up concerning the same abdomen wound. *Id.* at 976–77. PA-C Jacobs referred her to an infectious disease physician "given [the] history and reoccurrence of . . . infections" like the one that required the incision and drainage. *Id.* at 976.

On November 8, 2018, Plaintiff saw Dr. Hatiboglu regarding a respiratory infection. *Id.* at 974–75. Dr. Hatiboglu noted that "[t]his is a complex patient having significant respiratory illness." *Id.* at 974. Dr. Hatiboglu prescribed antibiotics, a nebulizer treatment, and, for asthma, Flovent. *Id.*

On February 1, 2019, Plaintiff saw PA-C Jacobs with concerns about a sore throat. *Id.* at 972–73.[6] PA-C Jacobs noted that Plaintiff had a history of "diabetes, MRSA, depression, and asthma" and that Plaintiff reported that "her asthma is slightly worsened." *Id.* at 972. PA-C Jacobs referred to this as "[m]ild intermittent asthma with acute exacerbation," and recommended an increase in Ventolin/Pro Air from twice a day to four times a day. *Id.* Plaintiff's BMI was recorded at 44.40. *Id.*

On February 18, 2019, Plaintiff visited Dr. Reichband for numbness in her left hand and forearm. *Id.* at 969–71. Dr. Reichband found the "[n]euro exam unremarkable with [the] exception of affected area decreased sensation," and placed a neurology referral "if there is no clear cause based on labs." *Id.* at 970.

Plaintiff had urinalyses and other tests taken on April 24, 2018; February 18, 2019; March 25, 2019; April 25, 2019; April 30, 2019; May 21, 2019; November 1, 2019; and November 4, 2019. *Id.* at 989–92. Results showed blood glucose levels ranging from 217 through 301 in the period from April 24, 2018 to November 4, 2019. *Id.* at 989. $A_1C$ levels ranged from 9.2 to 12.1 during the same period. *Id.* at 990.

On May 21, 2019, Plaintiff saw Dr. Reichbind for a urinary tract infection, which Dr. Reichband reported would be her "third UTI so far this year." *Id.* at 967–68.

---

[6] Plaintiff states in her Statement of Material Facts that this appointment occurred on September 27, 2017, and the Commissioner adopts that statement. Pl.'s SOMF ¶ 35; Def.'s SOMF ¶ 35. However, the record indicates that this appointment occurred on February 1, 2019.

On June 6, 2019, Plaintiff saw Dr. Marc Roy, a primary care physician, about a sore throat, which Dr. Roy assessed as a viral infection. *Id*. at 965–66.

On November 1, 2019, Plaintiff began seeing Dr. Christy Jackson, M.D., for treatment of depression and PTSD. *Id*. at 998–99. Plaintiff saw Dr. Jackson nineteen times between November 1, 2019, and June 10, 2020. *Id.* at 998–1006. Dr. Jackson reported that Plaintiff's sister died on December 6, 2019. *Id.* at 1000. On February 12, 2020, Plaintiff reported to Dr. Jackson that "that her antidepressant medication [had been] increased." *Id*. at 1002. On May 29, 2020, Plaintiff told Dr. Jackson that "her diabetes has been out of control in the past week" and that "she had two seizures on Monday due to low blood sugar." *Id*. at 1005.

On November 4, 2019, Plaintiff saw Dr. Reichbind about "worsening" depression and stress. *Id*. at 960–62. Dr. Reichbind's physical examination showed that Plaintiff had normal range of motion, muscle strength, muscle tone, motor function, and sensation. *Id.* at 960. Her BMI was 45.34. *Id*. at 960.

### 2. Disability Application

Plaintiff filed a Title II application for a period of disability and disability insurance on June 17, 2016, alleging disability beginning October 20, 2014. *Id*. at 28, 97–98.

On November 28, 2016, a disability specialist adjudicator denied Plaintiff's application, finding that her impairments (obesity, carpel tunnel syndrome, epilepsy, affective disorders, and anxiety disorders) were not severe enough to prevent her from adjusting to "other work" besides her past relevant work. *Id*. at 96–108.

On January 19, 2017, Plaintiff completed a request for a rehearing. *Id*. at 167.

On June 13, 2017, another adjudicator reaffirmed the denial of Plaintiff's application. *Id.* at 110–21. The medical consultant, Hedy Augenbraun, Ph.D., found that Plaintiff's condition was not severe enough to keep her from working. *Id.* at 126.

On July 25, 2017, Plaintiff completed a request for a hearing. *Id.* at 168.

An initial hearing was held on May 22, 2018. *Id*. at 130. On June 4, 2018, ALJ Eskunder Boyd issued a decision denying Plaintiff's application for benefits. *Id.* at 127–42. Impartial vocational expert Susan Howard testified at the hearing. *Id*. at 130, 142.

On July 30, 2018, Plaintiff filed, through her attorney, a written request with the Appeals Council for review of the ALJ's decision. *Id.* at 216–19.

On December 27, 2019, the Appeals Council vacated the hearing decision and remanded the case for a new hearing based on a challenge under the Appointments Clause, U.S. Const. Art. II, § 2, cl. 2, to the manner in with the ALJ was appointed. *Id.* at 148–50.

On May 18, 2020, a second hearing was held. *Id*. at 39–64. Plaintiff testified about her medical history, including her history of seizures and recent seizures, issues with her blood sugar levels, migraine headaches, carpel tunnel syndrome, depression, and PTSD. *Id.* at 49–58. Plaintiff had counsel, and Linda Vause testified as a vocational expert. *Id.* at 40, 58.

On June 29, 2020, ALJ John T. Molleur issued a decision denying Plaintiff's application for benefits. *Id.* at 14–28. On July 30, 2020, Plaintiff filed a written request with the Appeals Council for review of the ALJ's decision. *Id.* at 280–83.

On November 3, 2020, the Appeals Council denied the request for review and affirmed the ALJ's decision. *Id*. at 6–8.

### 3.  ALJ Decision

On June 29, 2020, ALJ Molleur issued his decision denying Plaintiff disability insurance benefits. *Id.* at 14–28.

At Step One of the sequential evaluation, ALJ Molleur found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 20, 2014. *Id.* at 20. At Step Two, ALJ Molleur found that Plaintiff had the following severe medically determinable impairments: "Seizure Disorder, Migraine Headaches, Carpel Tunnel Syndrome, Obesity, Type 1 Diabetes Mellitus, Depression, and Posttraumatic Stress Disorder[.]" *Id.* At Step Three, ALJ Molleur found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 20–21.

At Step Four, ALJ Molleur found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> she is unable to climb ladders, ropes or scaffolds, but she can perform other postural activities no more than occasionally. She can engage in frequent handling and fingering with the bilateral hands. She must avoid work at unprotected heights and also avoid close proximity to mobile machinery or exposed moving machinery parts. Additionally, she is limited to simple, routine, repetitive tasks; requiring no more than brief and incidental contact with the general public. She must avoid fast paced production work such as work requiring quotas but can adhere to a productivity standard.

*Id.* at 22.

At Step Five, ALJ Molleur determined that, given Plaintiff's age, education, work experience, and RFC, she could perform work that exists in significant numbers in the national economy. *Id.* at 27. The ALJ relied upon the testimony of impartial vocational expert Linda Vause that someone with Plaintiff's residual functional capacity could perform the following occupations: cleaner, photocopy machine operator, and marker. *Id.* at 28.

### B.  Procedural History

On December 22, 2020, Plaintiff filed this appeal. Compl., ECF No. 1 (Dec. 22, 2020).

On June 22, 2021, Plaintiff moved to reverse the decision of the Commissioner. Pl.'s

Mot. to Reverse the Decision of the Commissioner, ECF No. 18 (June 22, 2021) ("Pl.'s Mot.").

Plaintiff also filed a Statement of Material Facts. Pl.'s SOMF.

On September 20, 2021, the Commissioner moved to affirm the decision. Def.'s Mot. for

an Order Affirming the Decision of the Commissioner, ECF No 22 (Sept. 20, 2021) ("Def.'s

Mot."). The Commissioner also filed a response to Plaintiff's statement of facts. Def.'s SOMF.

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviewing a disability determination "must

determine whether the Commissioner's conclusions 'are supported by substantial evidence in the

record as a whole or are based on an erroneous legal standard.'" *Schaal v. Apfel*, 134 F.3d 496,

501 (2d Cir 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997)); *see also*

*Moreau v. Berryhill*, No. 17-CV-396 (JCH), 2018 WL 1316197, at *3 (D. Conn. Mar. 14, 2018)

("[T]he court may only set aside the ALJ's determination as to social security disability if the

decision 'is based upon legal error or is not supported by substantial evidence.'" (quoting

*Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998))).

"Substantial evidence is 'more than a mere scintilla.'" *Brault v. Soc. Sec. Admin.,*

*Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*) (quoting *Moran v. Astrue*, 569 F.3d 108,

112 (2d Cir. 2009)). "'It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Moran*, 569 F.3d at 112 (quoting *Burgess v. Astrue*, 537 F.3d

117, 127 (2d Cir. 2008)); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) ("Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971))). It is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448 (citing *Dickson v. Zurko*, 527 U.S. 150, 153 (1999)).

## III.   DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled under the Social Security Act, an ALJ must perform a five-step evaluation. As the agency explains:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled . . . .
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled . . . .
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled . . . .
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled . . . .
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled . . . .

20 C.F.R. § 404.1520(a)(4).

27

### A.  Development of the Record

"An ALJ in a social security benefits hearing has an affirmative obligation to develop the record adequately." *Herminia Torres v. Berryhill*, No. 3:17-CV-605 (DFM), 2019 WL 1416989, at *3 (D. Conn. Mar. 29, 2019) (internal citation omitted). "An ALJ's failure to request RFC assessments may be harmless, and thus no remand warranted, in cases where 'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.'" *Kurlan v. Berryhill*, 3:18-CV-00062 (MPS), 2019 WL 978817, at *2 (quoting *Tankisi v. Comm'r Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order)).

For example, "remand may be unnecessary where the ALJ rejects the medical opinion evidence in the record but the RFC formulation is supported by substantial evidence in 'contemporaneous treatment notes.'" *Id.* (quoting *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8–9 (2d Cir. 2017) (summary order)). Courts, however, "have upheld an ALJ's RFC finding only where the record is clear and, typically, where there is *some* useful assessment of the claimant's limitations from a medical source." *Staggers v. Colvin*, No. 3:14-CV-717 (JCH), 2015 WL 4751123, at *3 (D. Conn. Aug. 11, 2015) (internal citation omitted).

Plaintiff argues that the ALJ failed to develop the record in a manner that constituted "prejudicial error" and requires remand. Mem. of Law in Supp. of Pl.'s Mot. to Reverse the Decision of the Commissioner at 10, ECF No. 18-2 (June 22, 2021) ("Pl.'s Mem."). Specifically, she alleges that there are "significant, obvious gaps in the [r]ecord" because certain medical records were not included, such as function-by-function assessments from seven clinicians who treated Plaintiff: Dr. Hatiboglu, Dr. Reichbind, APRN Buller Slomkowski, PA-C Jacobs, APRN-BC Tierney, Dr. Bortan, and Dr. Jackson. *Id.* at 1–2.

Plaintiff additionally argues that ALJ Molleur failed to develop a complete medical record by making "no efforts" to "request[] a medical source statement from any of the [aforementioned] seven clinicians[.]" *Id.* at 3. According to Plaintiff, this failure runs counter to the ALJ's "regulatory obligations to develop a complete medical record before making a disability determination, 20 C.F.R. § 404.1515(d)–(f)." *Id.* at 3–4.

Plaintiff further argues that "[i]t is entirely unclear what the ALJ relied upon [as to Plaintiff's functional limitations], in that he found the opinions of the State Agency document-reviewing pediatricians to be entitled to '[s]ome weight[,]' . . . gave the opinions of LCSW McJunkins and Dr. Mejia 'little weight,' gave 'some weight' to the consultative examination report of Dr. Russolillo, and [gave] 'little weight' to Dr. Morris's opinions . . . . Without so much as a nod to his duty to develop the Record, the ALJ was content to play doctor." *Id.* at 9 (internal citation and quotation marks omitted).

The Commissioner responds that "it is the claimant's duty to prove she is disabled" and the agency's duty to make "every reasonable effort" to assist her in obtaining evidence. Def.'s Mem. in Supp. of her Mot. for an Order Affirming the Commissioner's Decision at 4–5, ECF No. 22-1 (Sept. 20, 2021) ("Def.'s Mem."). According to the Commissioner, the agency made "every reasonable effort," which means that it "ma[d]e an initial request and one follow-up request 10 to 20 days later." *Id.* at 5 (citing 20 C.F.R. §§ 404.1512(b)(1)(i), 416.912(b)(1)(i)). The Commissioner further argues that Plaintiff has not asserted "that these records actually exist or that she identified them to the agency or ALJ at any point during the development of the record." *Id.* (citing 20 C.F.R. § 404.935 ("Each party must make every effort to ensure that the administrative law judge received all of the evidence and must inform us about or submit any written evidence . . . no later than 5 business days before the date of the scheduled hearing.")).

As to the alleged failure to request function-by-function assessments, the Commissioner argues that "the record . . . was adequately developed to support the conclusion, and more was not required of the ALJ." *Id*. at 6 (citing *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (summary order)). The ALJ allegedly "found the evidence was sufficient to support an RFC finding for a reduced range of light work" by evaluating "Plaintiff's treatment notes, her statements about her symptoms, and the various medical opinions[.]" *Id*. at 7. According to the Commissioner, the ALJ was therefore "not required to request an opinion from a treating physician." *Id*. (citing *Turcotte v. Commissioner of Soc. Sec.*, No. 3:17-CV-1981 (JAM), 2018 WL 6075672, at *5 (D. Conn. Nov. 21, 2018)).

The Commissioner argues that the Second Circuit's decision in *Guillen v. Berryhill*, 697 F. App'x 107 (2d Cir. 2017) (summary order), which found the record incomplete where the ALJ failed to request a treating source statement, is distinguishable because there the Second Circuit found that the medical records "obtained by the ALJ did not shed any light on the claimant's RFC." *Id*. (internal citation and quotation marks omitted).  In this case, the Commissioner argues, "the ALJ . . . considered no fewer than four medical opinions, Plaintiff's treatment records, and other evidence regarding Plaintiff's functioning, including her reported activities[.]" *Id*. at 7–8.

Finally, the Commissioner notes that "[t]here is no indication in the record that Plaintiff's counsel advised the Appeals Council that she believed the record was not appropriately developed, nor is there evidence that Plaintiff's counsel attempted to submit any treating source opinions or additional medical evidence before the Appeals Council denied Plaintiff's request for review." *Id*. at 9. Accordingly, the Commissioner argues, Plaintiff's request to remand for further development should be rejected. *Id*.

The Court agrees.

The record in this case "contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity," *Tankisi*, 521 F. App'x at 34, and so ALJ Molleur did not err by not requesting a medical source statement from the seven treating physicians. In addition to the consultative examiner's report, the record contains an assessment from two of Plaintiff's treating clinicians, LCSW McJunkins and Dr. Mejia, and nearly seven years' worth of contemporaneous treatment notes, including from the seven physicians that Plaintiff lists in her memorandum in support of the motion to reverse. *See* Pl.'s Mem. at 2; *see also Janes*, 710 F. App'x at 34 (concluding that the ALJ properly gathered and analyzed the evidence where the ALJ did not obtain medical records for the ten months prior to the decision, but the record contained "over 450 pages of plaintiff's medical history for the 8 years prior to the filing" of the claim and two consultative examination reports and opinions); *cf. D'Agostino v. Berryhill*, No. 3:19-CV-00610 (RAR), 2020 WL 4218213, at *4 (D. Conn. July 3, 2020) ("Unlike *Crespo*, the record here was not supported by either a consultative examiner's opinion or the treating physician's notes. The ALJ only cited raw medical data and failed to incorporate evidence demonstrating that plaintiff's allegations of pain and asserted limitations were inconsistent with the record." (citing *Crespo v. Comm'r of Soc. Sec.*, No. 3:18-CV-00435 (JAM), 2019 WL 4686763 (D. Conn. Sept. 25, 2019))).

The contemporaneous treatment notes, moreover, discuss her "ability to undertake her activities of everyday life." *See, e.g.*, Tr. at 483, 486, 491, 511–17, 556, 571, 805–07, 982–83, 960 (noting the positive effect medications were having on Plaintiff's conditions, her general ability to care for herself and her family, and her overall strength and ability to move); *cf. Guillen*, 697 F. App'x at 109 (remanding a case where the ALJ failed to obtain a medical source

statement and, notably, "[t]he medical records discuss [the claimant's] illnesses and suggest treatment for them, but offer no insight into how [the claimant's] impairments affect or do not affect [the claimant's] ability to work, or [the claimant's] ability to undertake her activities of everyday life"). The record also "does not indicate that plaintiff requested that [s]he be evaluated by h[er] treating physicians, or that [s]he timely objected to being evaluated by other doctors." *Janes*, 710 F. A'ppx at 34.

Accordingly, ALJ Molleur did not fail to develop the record.

### B.  The Treating Physician Rule

The treating physician rule gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (same) (internal citations omitted).

Although, in general, courts "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), an ALJ must articulate "good reasons" for the weight given to treating source opinions, *Camille v. Colvin*, 652 F. App'x 25, 27 (2d Cir. 2016) (summary order) (internal citation omitted); *see also Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (summary order) ("An ALJ must 'give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion.'" (quoting *Halloran*, 362 F.3d at 32 (internal citations omitted)).

Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician" can be a basis for remand. *Burgess*, 537 F.3d at 129–30 (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *see also Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) ("If 'the Commissioner has not [otherwise] provided good reasons [for its weight assignment],' we are unable to conclude that the error was harmless and consequently remand for the ALJ to 'comprehensively set forth [its] reasons.'" (citing *Halloran*, 362 F.3d at 33) (internal citation and quotation marks omitted)).

Plaintiff argues that ALJ Molleur failed to apply the treating physician rule, because "'the SSA gives deference to the views of the physician who has engaged in the primary treatment of a claimant'" and, where controlling weight is not given to the physician, the ALJ must "'specifically explain the weight that is actually given to the opinion.'" Pl.'s Mem. at 11 (quoting *Shrack v. Astrue*, 608 F. Supp. 2d 297, 300–01 (D. Conn. 2009)). Specifically, she notes that "the ALJ gave 'little weight' to the statement provided by LCSW McJunkins and Dr. Mejia" and that

> [i]nstead of requesting . . . a function-by-function evaluation [from LCSW McJunkins and Dr. Mejia]—as he was required to do—the ALJ brushed it aside by stating "the mental status examinations of record are largely intact. The claimant has not required mental health hospitalization or inpatient care during the relevant period, and she has retained considerable abilities with respect to daily activities.

*Id*. at 12–14 (quoting Tr. at 26). In addition to assigning "little weight" to LCSW McJunkins and Dr. Mejia's statement, ALJ Molleur assigned "some weight" to the State Agency document reviewers "who never laid eyes on [Plaintiff]." *Id*. at 15. In so doing, according to Plaintiff, ALJ Molleur "'arbitrarily substitute[d] his own judgment for competent medical opinion.'" *Id*. (quoting *McBrayer v. Sec'y of Health & Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)).

The Commissioner argues that "to the extent that the ALJ did not explicitly consider each *Burgess* factor, the ALJ provided good reasons for affording little weight to the April 2018 opinion evidence from Dr. Morris . . . ." Def.'s Mem. at 10; *see Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (listing the factors that ALJs must consider when deciding how much weight an opinion deserves). The Commissioner notes that the ALJ "acknowledged that Dr. Morris was a treating provider, but found that the contradictory nature of his opinion gave it little evidentiary value." Def.'s Mem. at 10–11 (citing Tr. at 26). Specifically, as the ALJ noted in his decision, Dr. Morris "first indicated that Plaintiff had only moderate limitations in all areas of mental functioning"; then "inexplicitly assessed that Plaintiff met the listing for PTSD, suggesting that she was disabled based on this one impairment"; and then stated that "Plaintiff had 'unlimited or very good' ability to perform all mental abilities and aptitudes needed to do unskilled work." *Id.* at 11.

The Commissioner argues that "[c]ontradictory assessments are proper grounds for limiting the weight of medical source statements." *Id.* at 11 (citing *Tricarico v. Colvin*, 681 F. App'x 98, 100–01 (2d Cir. 2017) (summary order) ("Although a treating physician's assessment is typically given more weight than other examiners' assessments, internal inconsistencies, and the conflicting opinions of other examining physicians, where supported by evidence in the record, can constitute substantial evidence to support not according the treating physician's opinion controlling weight, as well as good reasons to attribute only limited weight to that opinion.").

The Commissioner further argues that the ALJ is not required to recontact a physician to resolve a conflict or ambiguity in the evidence provided. *Id.* at 12 (citing 77 Fed. Reg. 10651-01, 2011 WL 7404303 (Feb. 23, 2012)). The Commissioner argues that "[c]urrent SSA regulations

provide that even where the evidence is inconsistent, recontacting a medical source is just one of several available options to develop the record." *Id.* (citing 20 CFR § 404.1520b(b)). Finally, as to Dr. Morris, the Commissioner notes that the inconsistency "was only one factor the ALJ considered in assigning little weight" and that the ALJ "also found Dr. Morris's own treatment notes were inconsistent with any finding of more severe restrictions," which is a valid reason for assigning little weight under 20 C.F.R. §§ 404.1527, 416.927. *Id.* (citing Tr. at 26).

As to LCSW McJunkins and Dr. Mejia's statement, the Commissioner argues that the ALJ "gave good reasons for not crediting their statement": the disability question "is an issue reserved to the Commissioner and not due any special significant weight"; the ALJ found their statement "inconsistent with the record, noting that Plaintiff's mental status examinations were largely intact"; and "the ALJ concluded that their finding was inconsistent with Plaintiff's conservative treatment—not requiring any hospitalizations or inpatient care during the relevant period . . . ." *Id.* at 12–13. Likewise, the ALJ assigned some weight to the State Agency consultants "because they were generally consistent with the record." *Id.* at 13 (citing Tr. at 25– 26, 119–26).

The Court agrees.

ALJ Molleur provided good reasons for attributing little weight to the opinions of LCSW McJunkins, Dr. Mejia, and Dr. Morris. As noted in ALJ Molleur's decision, LCSW McJunkins and Dr. Mejia's statement mainly "indicates that the claimant is expected to be unable to work for a period of 6 months," Tr. at 26. This is a "[a] statement by a medical source that [the claimant is] 'unable to work,'" which is not a "medical opinion." 20 C.F.R. § 404.1527(d) ("Opinions on some issues, such as the examples that follow, are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative

findings that are dispositive of a case, i.e., that would direct the determination or decision of disability."); *id.* § 404.1527(d)(1) ("Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) . . . your residential functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.").

As ALJ Molleur noted, LCSW McJunkins and Dr. Mejia's finding was "also inconsistent with the record," which did not reveal that Plaintiff's issues made tasks difficult or impossible. Tr. at 26; *cf. Davenport v. Saul*, No. 3:18-CV-1641 (VAB), 2020 WL 1532334, at *31 (remanding where the treating clinicians' opinions were assigned little weight and "[t]he record indeed contain[ed] evidence that either [the claimant's] psychological symptoms or his back and shoulder issues could have resulted in a finding of a more reduced residual functional capacity"). Notably, as late as November 4, 2019, Plaintiff's medical records revealed that she had normal range of motion, muscle strength, muscle tone, motor function, and sensation. Tr. at 960.

ALJ Molleur appropriately noted that Dr. Morris's opinion was "contradictory," as it indicated both that Plaintiff had moderate limitation in the assessed areas of mental functioning and that she had "unlimited or very good" capabilities in all areas of mental functioning. *Id.* at 26, 953, 955. ALJ Molleur also noted that a "more restrictive limitation" read into Dr. Morris's opinion "is inconsistent with this provider's treatment records." *Id.* at 26.

Indeed, Plaintiff's treatment records do not indicate any serious mental limitations and though they "show a variable mood," they also consistently demonstrate "a calm and cooperative demeanor, good eye contact, linear and logical thought process, intact cognition, good judgment, and fair or partial insight[.]" *Id.* at 26. For example, in December 2014, Plaintiff reported "significant improvement in moods" and stated that her depression was "resolved." *Id.* at 511–

36

17. Plaintiff continued receiving therapy and medication to tend to her mental health, and in

January 2017 was well enough to look after both her five-year old son and her sister, who had

multiple sclerosis and required physical therapy. *Id.* at 805–07.

To be sure, Plaintiff has suffered from a history of impairments, which ALJ Molleur

acknowledged. *Id.* at 20. But ALJ Molleur considered the medical record, acknowledged

Plaintiff's mental health history and treatment records, *id.* at 23–25, and then "limited

[Plaintiff's] to a range of light work" given "the combined impact of [her] physical

impairments." *Id.* at 25.

Accordingly, ALJ Moeller provided "good reasons" for not crediting the treating

physicians' opinions, and no remand on that basis is required. *See Burgess*, 537 F.3d at 129

("Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating

physician is a ground for remand.").

### C.  Step Five

In *McIntyre v. Colvin*, the Second Circuit held that "a vocational expert is not required to

identify with specificity the figures or sources supporting his conclusion, at least where he

identified the sources generally." 758 F.3d 146, 152 (2d Cir. 2014). In that case, the vocational

expert "was not required to articulate a more specific basis for his opinion" where "the ALJ

reasonably credited this testimony, which was given on the basis of the expert's professional

experience and clinical judgment, and which was not undermined by any evidence in the record."

*Id*.

Plaintiff claims that ALJ Molleur's Step Five findings are "[u]nsupported." Pl.'s Mem. at

16. Plaintiff argues that ALJ Molleur "based his Step Five findings exclusively on the testimony

of vocational witness Linda Vause," whose "methodology [was] defective" because she did not

identify the sources "used to arrive at her national job incidence testimony[.]" *Id.* at 16–17, 21.

Ms. Vause only noted that her testimony was consistent with the Dictionary of Occupational

Titles ("DOT"), which "merely defines jobs [and] does not report the number of jobs available in

the national economy." *Id.* at 17 (citing *Hernandez v. Berryhill*, No. 3:17-CV-00368 (SRU),

2018 WL 1532609 (D. Conn. Mar. 29, 2018)).

According to Plaintiff, ALJ Molleur's hypothetical question to Ms. Vause was also

defective because the RFC failed to contain headache and carpal-tunnel related limitations. *Id.* at

22. She also argues that the question was defective because the frequency of Plaintiff's medical

treatment would not allow her to "secure and maintain employment." *Id.* at 23.

The Commissioner argues that "[t]he ALJ . . . reasonably concluded at step five that there

are jobs that exist . . . that Plaintiff could perform[.]" Def.'s Mem. at 15. First, the Commissioner

argues that Plaintiff's argument concerning the vocational expert's methodology fails for three

reasons: the vocational expert's testimony, based on her experience, was sufficient, *id.* at 16–19

(citing *Biestek v. Berryhill*, 139 S.Ct. 1148 (2019); *McIntyre*, 758 F.3d at 152); vocational

experts are "not require[d] . . . to identify [their] sources in order for the ALJ to rely on the job

incidence testimony," *id.* at 17–18 (citing *Stonick v. Saul*, No. 3:19-CV-01334 (TOF), 2020 WL

6129339 (D. Conn. Oct. 19, 2020)); and Plaintiff's counsel had an opportunity to question the

expert at the hearing regarding her methodology, but did not ask, *id.* at 15–16 (citing *Crespo*,

2019 WL 4686763, at *8).

As to Plaintiff's argument that ALJ Molleur's hypothetical question was defective, the

Commissioner argues that "the ALJ properly considered the record as a whole in evaluating

Plaintiff's RFC" and that the hypothetical question was "consistent with the ALJ's eventual RFC

finding." *Id.* at 19–20 (citing *Priel v. Astrue*, 453 F. App'x 84, 87–88 (2d Cir. 2011) (summary

order)). ALJ Molleur's hypothetical, the Commissioner notes, included restrictions pertaining to both Plaintiff's headaches and carpal tunnel syndrome, and included limitations to the extent "supported by the record." *Id.* at 19. According to the Commissioner, the ALJ therefore "properly relied on the vocational expert's testimony, and the ALJ's step five finding is supported by substantial evidence." *Id.* at 20–21.

The Court agrees.

Since *Hernandez*, where the court remanded the case because the Dictionary of Occupational Titles is not "a sufficient basis for the vocational expert's opinion . . . regarding the *number* [of jobs]," *Hernandez*, 2018 WL 1532609, at *15, the Supreme Court decided *Biestek v. Berryhill*, and rejected a categorical rule precluding vocational expert testimony from being considered substantial evidence where the expert refuses, upon request, to provide the sources used to reach their conclusion. *Biestek*, 139 S.Ct. at 1149. And since *Biestek*, courts in *Crespo*, 2019 WL 4686763, at *9, and *Stonick v. Saul*, No. No. 3:19-CV-01334 (TOF), 2020 WL 6129339, at *17–18 (D. Conn. Oct. 19, 2020), have interpreted that Supreme Court decision as supporting the conclusion that a vocational expert's failure to identify their sources does not preclude the existence of substantial evidence for an ALJ's conclusion. Here, consistent with the Second Circuit's *McIntyre* opinion, "the ALJ reasonably credited [Ms. Vause's] testimony, which was given on the basis of the expert's professional experience and clinical judgment, and which was not undermined by any evidence in the record." 758 F.3d at 152; *see* Tr. at 58–61. Moreover, Plaintiff has not questioned Ms. Vause's experience and judgment.

As to Plaintiff's claim that that ALJ Molleur's hypothetical question was defective, the Court has already concluded, *supra*, that the ALJ properly considered the record as a whole in evaluating Plaintiff's residual functioning capacity. ALJ Molleur "properly declined to include in

his hypothetical question symptoms and limitations that he had reasonably rejected." *Priel*, 453 F. App'x at 87–88.

Accordingly, ALJ Molleur did not err in his Step Five analysis.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion is **DENIED**.

The Commissioner's motion is **GRANTED** and, accordingly, the decision of the Commissioner is **AFFIRMED**.

The Clerk of Court respectfully is directed to close the case.

**SO ORDERED** at Bridgeport, Connecticut, this 31st day of March, 2022.

  /s/ Victor A. Bolden

Victor A. Bolden
United States District Judge
